UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LORIANN KHANI,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>REGENCE BLUESHIELD, a Washington non-profit corporation, and THE BOEING TRADITIONAL MEDICAL PLAN,<br><br>　　　　Defendants. | Case No. C09-1067 TSZ<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came on for trial by the Court on the administrative record (the "Record"). The matter was noted for consideration on July 1, 2011. As of that date, the parties had submitted (i) the Record (docket no. 44), (ii) the supplement to the Record consisting of the 2007 Select Network Plan (Nonunion) Guide to Benefits (docket no. 56-1, Ex. A), (iii) Declaration of Loriann Khani (docket no. 48), (iv) trial briefs, and (v) proposed Findings of Fact and Conclusions of Law. Having reviewed these materials, the Court now makes the following Findings of Fact and Conclusions of Law:

## I.   FINDINGS OF FACT

### A.   Background

1.      As an employee of the Boeing Company, Plaintiff Loriann Khani is eligible to receive benefits under the Boeing Traditional Medical Plan (the "Plan"), a Defendant in this litigation.  AR 665.

2.      The Plan provides medical treatment for Plan participants.  AR 665.

3.      The Boeing Company is the Plan sponsor and contributes to a trust which primarily pays the cost of coverage under the Plan.  AR 741.

4.      Boeing designated the Employee Benefit Plans Committee ("the Committee") to be the Plan Administrator.  AR 740.  With respect to the Plan, the Committee "has the exclusive right, power, and authority, in its sole and absolute discretion, to [a]dminister, apply, construe, and interpret the Plan . . . [and to d]ecide all matters and questions arising in connection with entitlement to benefits."  AR 740.

5.      The Committee delegated administrative duties and responsibilities to Regence Blueshield ("Regence"), also a Defendant in this litigation, as third party administrator for processing medical and hospital services claims.  AR 684.  Regence handles the day-to-day administration of the plan, including making benefit decisions, paying claims, processing claim appeals, and accounting for premiums, service fees, and claim costs.  AR 684.  Regence also handles the first and second level appeals of claim denials.  See AR 684.

6. With regard to Plaintiff's claims, Regence administered the Plan according to the 2008 Plan Description ("Plan Description"), AR 583, 663, which states: "[i]f the service representative approves your request for preadmission review or preapproval for a hospital or skilled nursing facility stay, the plan will pay its regular benefit when the bill is submitted for payment," AR 693. The Plan Description additionally states that certain services and supplies are specifically excluded by the Plan, including "[o]besity services or supplies, *unless approved in advance* as medically necessary by the service representative according to written guidelines." AR 711 (emphasis added).

7. Further, the Plan Description states, "The plan covers cosmetic surgery . . . [w]hen it is required to correct an abnormal function." AR 695. Regence's Medical Policy entitled "Surgery Section – Cosmetic and Reconstructive Surgery" explains, "A functional impairment is defined as a state in which the special, normal or proper action of any body part or organ is damaged. . . . [S]ome dermatologic conditions may significantly alter the function of the skin." AR 2.

8. Under the terms of the Plan Description, a treatment is medically necessary if it is:

- Required to diagnose or treat the patient's illness, injury, or condition, and the condition cannot be diagnosed or treated without it;

- Consistent with the symptom or diagnosis and the treatment of the condition;

- The most appropriate service or supply that is essential to the patient's needs;

- Appropriate as good medical practice;

- Professionally and broadly accepted as the usual, customary, and effective means of diagnosing or treating the illness, injury, or condition;

- Unable to be provided safely to the patient as an outpatient (for an inpatient service or supply).

AR 688.

9.      In addition, Regence administered the Plan according to a published

Medical Policy on Cosmetic and Reconstructive Surgery, which states the following:

>        [R]econstructive is often taken to mean that the service "returns the patient to whole" and cosmetic is often interpreted as meaning the restoration of appearance only . . . .
>                . . . .
>                . . . The definition of reconstructive may be based on two distinct factors: 1) whether the service is primarily indicated to improve or correct a functional impairment or is primarily to improve appearance; and 2) what the etiology of the defect is (e.g., . . . post-therapeutic intervention[)]. . . .  Cosmetic services are usually considered to be those that are primarily to restore appearance and that otherwise do not meet the definition of reconstructive or those whose etiology is not exempted from the definition of cosmetic.
>                . . . .
>                . . . The determination of coverage eligibility typically depends on the etiology of the condition.  For example, the [exclusion for cosmetic services] may include "all services primarily to improve appearance, *except those due to prior trauma or therapeutic interventions*." . . .
>                Categories of conditions that may be included as part of the contractual definition of reconstructive services include the following: a) *post-surgery* . . . .

AR 1-2 (emphasis added).

**B.      Plaintiff's 2006 Operation: Open Gastric Bypass Surgery**

10.      In February 2006, Plaintiff received open gastric bypass surgery, which constituted obesity services that had been pre-approved by Regence.  AR 487, 648.  As a result, Plaintiff lost over 100 pounds.  AR 487.   This weight loss, combined with a chronic cough, caused Plaintiff to develop a large ventral hernia at the site of the surgical incision as well as panniculitis (inflammation of her pannus), manifesting as recurrent infrapannicular rashes, ulcerations, and infections.  AR 486, 488, 492, 516.

**C.      Requests for Pre-Approval of Two Procedures**

11.      To address these complications of her bypass surgery, Plaintiff's physicians requested pre-approval to perform a ventral hernia repair with component separation in combination with a panniculectomy.  AR 486, 488, 497, 508.

12.      In describing the ventral hernia repair with component separation, Dr. Keith T. Paige's outpatient clinic note, dated April 24, 2007, stated, "I agree with Dr. Hunter that the best course of action would be a combination procedure of ventral hernia repair with a component separation to both reinforce mesh repair as well as to reconstitute the dynamic and proper functional domain of the abdominal wall."  AR 488.

13.      Regarding the panniculitis, Dr. Paige's note stated, "She now presents with a symptomatic abdominal pannus with recurrent infrapannicular rashes requiring medicated powders and ointments to take care of.  They do progress[ ]to ulcerations and pain."  AR 488.  Documenting physical examination findings, Dr. Paige noted, "She has significant rashes particularly on the right side in the inguinal region with evidence of

some ulceration." AR 488. Dr. Paige explained that the panniculectomy was medically

necessary "given the symptomatic nature of [Ms. Khani's] abdominal pannus with

recurrent rashes, infections, and ulcerations as well as a significant overhang.

Additionally, removing this tissue would enhance healing and reduce opportunities for

infection because it would reduce the amount of[ ]devascularized tissue from the

component separation itself." AR 488.

14.     In a letter to Regence dated June 13, 2007, Dr. Paige wrote:

> The patient has had previous open gastric bypass with over
> 100 lb. weight loss.  This has resulted in an overhanging
> abdominal pannus with recurrent infrapannicular rashes and
> sores.  I fear that repair of her incisional hernia in conjunction
> with abdominal wall reconstruction using component muscle
> flaps will carry a significant risk of wound infection and poor
> healing due to devascularization of her marked abdominal
> pannus.  In view of this I believe that concurrent
> panniculectomy will improve her healing and lower her risk
> of infection and significant skin and fat necrosis.  In no sense
> is this procedure cosmetic and in fact, I have discussed with
> Ms. Khani that her abdomen will <u>not</u> be flat or necessarily
> improved from an appearance standpoint after the proposed
> procedure.  I believe that the panniculectomy is a medically
> necessary part of the treatment of her hernia given its
> complexity and her other medical problems most noteably a
> longstanding vigorous chronic cough.

AR 508.

15.     In a letter to Regence dated June 11, 2007, Dr. Jeffrey A. Hunter wrote:

> The patient has had previous laparoscopic gastric bypass with
> over 100 lb. weight loss.  This has resulted in an overhanging
> abdominal pannus with recurrent infrapannicular rashes and
> sores.  I fear that repair of her unrelated incisional hernia
> [will] carry a significant risk of wound infection and poor
> healing due to this pannicular problem.  In view of this I

believe that concurrent panniculectomy will improve her healing and lower her risk of infection as well as diminish the chance of recurrence of her incisional hernia.

AR 497.

16.     None of the materials submitted for purposes of gaining pre-approval for the hernia repair and panniculectomy mentioned the possibility of abdominoplasty, a primarily cosmetic procedure involving the removal of excess skin and fat.  AR 486-90, 496-99, 506-09; Am. Soc'y of Plastic Surgeons, <u>ASPS Recommended Insurance Coverage Criteria for Third-Party Payers; Abdominoplasty and Panniculectomy Unrelated to Obesity or Massive Weight Loss</u> (Jan. 2007), http://www.plasticsurgery.org/Documents/medical-professionals/health-policy/insurance/Abdominoplasty-and-Panniculectomy.pdf (defining abdominoplasty; referenced by MAXIMUS at AR 554).  The materials only discussed the expected performance of a ventral hernia repair with component separation and panniculectomy. <u>See</u> AR 486-90, 496-99, 506-09.

17.     As stated in a letter to Ms. Khani dated June 7, 2007, Regence pre-approved coverage for the ventral hernia repair, presumably with component separation, but denied preauthorization for the panniculectomy.  <u>See</u> AR 494 ("[W]e are unable to provide coverage for a panniculectomy. . . .  However, it has been determined to authorize a ventral hernia repair.").  Regence pre-approved coverage for the hernia repair with component separation because Ms. Khani's hernia was considered to be a complication of the gastric bypass surgery, which was obesity surgery for which Regence

had pre-approved coverage.  <u>See</u> AR 493, 501.  Regence denied coverage for the panniculectomy because it deemed that it was primarily cosmetic in nature and did not meet the criteria for medical necessity.  AR 494.  Regence's explanation to Ms. Khani stated, "According to the documentation submitted, there is a lack of functional impairment resulting from the presence of the pannus.  It appears that the primary purpose of this procedure is for feature alteration."  <u>Id.</u>  After Ms. Khani requested reconsideration of the denial, Regence issued another letter, dated June 27, 2007, stating, "there is [sic] no documented functional abnormalities or significant complications of the pannus in the information submitted."  AR 504.  Regence's communications with Ms. Khani regarding pre-approval did not discuss abdominoplasty.  AR 494-95, 504-05.

       18.     In order to receive the operation, Ms. Khani pre-paid Virginia Mason Hospital (the "Hospital") $6,000 for doctor's fees associated with the panniculectomy. Khani Decl. at ¶ 6 (docket no. 48); Pl.'s Trial Br. 4; Pl.'s Compl. ¶ 4.10.

**D.     Plaintiff's 2007 Operation: Ventral Hernia Repair with Component Separation and Panniculectomy**

       19.     On June 28, 2007, Dr. Hunter and Dr. Paige operated on Ms. Khani to address the "symptomatic incisional hernia and chronic infrapannicular rash and infection," conditions listed as preoperative and postoperative diagnoses on the Hospital operative record.  AR 515.  The operative record indicated that Dr. Hunter performed the

ventral hernia repair and Dr. Paige performed the component separation aspect of the hernia repair and panniculectomy.[1]  AR 515-20.

20.     The operative record did not mention performance of an abdominoplasty. AR 515-20.  In fact, Ms. Khani's physicians never described performance of an abdominoplasty in any of their pre- or post-service descriptions of the operation.  See AR 486-90, 496-99, 506-09, 515-20.  In addition, Ms. Khani and her physicians never sought pre-approval or post-service coverage for an abdominoplasty.  See AR 486-90,[2] 496-99, 506-09, 526-30, 547-48.

21.     On August 9, 2007, Regence paid $14,028.19 to the Hospital for hospital/non-provider services related to the June 2007 operation, and the Hospital credited Ms. Khani's account $21,276.45.  AR 529.  A bill from the Hospital indicated that Regence's payment covered services including $15,708.00 for "OR services,"

---

[1] The portion of the record written by Dr. Hunter stated, "repair is planned in conjunction with Dr. Keith Paige, [who will perform] a panniculectomy and abdominal wall component separation. . . . we proceeded to design a piece of mesh that would accommodate the abdominal wall component separation by Dr. Paige to take tension off of this aspect of the repair.").  AR 519-20.

[2] The only suggestion that Ms. Khani's physicians made regarding performance of an abdominoplasty was in the original pre-approval request for the 2007 operation, in which they listed CPT code 15831 (along with a CPT code for ventral hernia repair, code 49560).  See AR 486.  Panniculectomy and abdominoplasty are two different procedures that historically shared the same CPT code of 15831.  Am. Soc'y of Plastic Surgeons, ASPS Recommended Insurance Coverage Criteria for Third-Party Payers; Abdominoplasty and Panniculectomy Unrelated to Obesity or Massive Weight Loss (Jan. 2007), http://www.plasticsurgery.org/Documents/medical-professionals/health-policy/insurance/Abdominoplasty-and-Panniculectomy.pdf (referenced by MAXIMUS at AR 554).  However, although Ms. Khani's surgeons consistently discussed panniculectomy in their descriptions of the operation, they never mentioned the possibility of an abdominoplasty. See AR 486-90, 496-99, 506-09, 515-20.

$1083.60 for "med-sur supplies," and $470.00 for anesthesia.  Id.  The bill did not indicate which portions of services and costs related to each procedure performed.  Id.  As a result of the payment, no further payment was due at the time regarding hospital services related to the surgery.  Id.

**E.      Plaintiff's Appeals Regarding the Panniculectomy**

22.      Pursuant to Regence's review process, plaintiff submitted a first appeal and a second appeal of the denial of coverage for the panniculectomy, both of which were mandatory.  See AR 521-536, 549-558, 585.  Ms. Khani's appeal did not raise any issue regarding the ventral hernia repair with component separation, which Regence had already covered.  See id.  As permitted by Regence's appeal policy, the second appeal was sent for external review by the MAXIMUS Center for Health Dispute Resolution ("MAXIMUS").  AR 550-56, 585.  Ms. Khani did not pursue a third, voluntary appeal.  AR 584.

23.      Without mentioning the ventral hernia repair with component separation procedure, Regence's letter to Ms. Khani regarding her first appeal, dated March 20, 2008, stated that Ms. Khani underwent a "complex abdominoplasty" and panniculectomy, neither of which would be covered.  AR 543.  Regence's reasoning was that the documentation submitted did not provide "evidence of any medical complications or functional impairment to support the need for either of these services," and therefore "these procedures were accomplished primarily to achieve feature alteration."  AR 543.  The letter further stated that "the charges for a complex

abdominoplasty were paid in error and will be taken back." Id. The letter did not discuss

whether or how the ventral hernia repair with component separation procedure related to

the alleged abdominoplasty and it did not indicate whether or how the hernia repair

would be covered. Id. In fact, the letter did not mention the hernia repair. Id.

24. Regence's letter to Ms. Khani regarding her second appeal, dated

September 8, 2008, reiterated that Ms. Khani underwent a "complex abdominoplasty"

and panniculectomy, neither of which would be covered. AR 556. Regence explained

why it would "uphold the original determination denying coverage for these services" by

stating:

> The preoperative photographs did not document any rashes, skin
> sores, or interigo [sic] beneath the pannus. In addition, the
> information submitted did not indicate failure of conservative
> management, such as what medications were used, the duration of
> use, or the results of various treatments, and did not document any
> medical complications or loss of function related to the abdominal
> pannus. Furthermore, it appears that these procedures were
> accomplished primarily to achieve feature alteration.

Id. In its response to Ms. Khani's second appeal, Regence again failed to address

payment of the hernia repair with component separation and whether or how the repair

related to the alleged abdominoplasty. See id.

25. Regence's reviewers considered the component separation aspect of the

hernia repair to be an abdominoplasty. See AR 538 (a reviewer at Regence wrote, "the

plastic surgeon accomplished a complex abdominoplasty after the ventral hernia repair

with mesh was accomplished."). However, Regence did not inform Ms. Khani of this

assumption, much less explain its reasoning.  <u>See</u> AR 494-95, 504-05, 541-45, 556-65.

In addition, Regence provided no explanation in the Record for this assumption.  <u>See</u>

AR 492-95, 501-05, 537-40, 550-55.  In particular, Regence did not explain why it

thought the component separation was not an integral aspect of the hernia repair

procedure or why the component separation was equivalent in any way to

abdominoplasty.  <u>See</u> <u>id.</u>

26.     On February 27, 2009, Regence sent a letter to Ms. Khani's counsel with

documents and records relevant to the Plan's "denial of coverage for the complex

abdominoplasty and panniculectomy *and related procedures* rendered to Lorrian [sic]

Khani from June 28, 2007 through July 2, 2007."  AR 583 (emphasis added).

**F.      Refund of Payments by Regence to the Hospital**

27.     Contemporaneous with its response to Ms. Khani's first appeal, Regence

demanded a refund from the Hospital in the amount of $4,264.44, representing the

negotiated rate for all of the procedures performed by Dr. Paige.  AR 541.  However, the

Hospital actually refunded $14,028.19 to Regence rather than just the $4,264.44

demanded.  Khani Decl. ¶ 12 (docket no. 48).  Prior to initiation of this lawsuit, Regence

retained the full refund without indicating whether or how it would pay the costs

associated with the ventral hernia repair with component separation.  Khani Decl. ¶ 12

(docket no. 48); <u>see</u> AR 541-662.

28.     The Hospital reversed the negotiated-rate adjustment of $21,276.56 and

sought payment from Ms. Khani for the un-negotiated retail cost of Ms. Khani's surgery,

$35,304.64.  Khani Decl. ¶ 12 (docket no. 48).  The Hospital's collection agency

eventually sued Ms. Khani in state court for $35,304.64, and those proceedings were

stayed pending the outcome of this case.  Khani Decl. ¶ 12 (docket no. 48).

29.     After the Court denied Defendants' Motion for Summary Judgment by

highlighting that "[t]he question is whether some portion of the hospital charges related

to the incisional hernia repair were erroneously refunded to Regence," and "[D]efendants

cannot establish a proper exercise of their discretion in . . . obtaining and obtaining a full

refund," Order 6-7, Mar. 31, 2011, Defendants apparently conceded their error.  Defs.'

Reply to Pl.'s Trial Br. 2-3 ("Following the Court's March 31, 2011 Order, the Plan

reassessed whether some portion of the refunded charges from [the Hospital] related to

the covered ventral hernia repair and, therefore, should not have been refunded.").  On or

around June 30, 2011 Regence paid the Hospital $10,461.87 for the ventral hernia repair.

Defs.' Reply to Pl.'s Trial Br. Ex. B.  This unilateral payment reflected Defendants'

attempt to separate the costs of the ventral hernia repair from the "costs associated with

the non-covered procedures."  Defs.' Reply to Pl.'s Trial Br. 3.  Nevertheless, the

payment did not account for the time and resources taken for performance of the

component separation aspect of the hernia repair.  See Defs.' Reply to Pl.'s Trial Br. 3,

Ex. A (in their explanation of the payment, Defendants discussed denial of coverage for

the panniculectomy and "abdominoplasty" without mentioning the time and resources taken to perform the component separation aspect of the repair).[3]

## II. CONCLUSIONS OF LAW

### A.    Jurisdiction

1.    This Court has jurisdiction pursuant to 29 U.S.C. § 1132(a)(1)(B), (a)(3), & (e)(1), which entitles Plaintiff to bring this action in U.S. district court to recover benefits due under the terms of the Plan, which, as the parties agree, is governed by the Employment Retirement Income Security Program ("ERISA").  Venue is proper under 29 U.S.C. § 1332(e)(2) because the Defendants are doing business within this District. See AR 4.

### B.    Discretionary Authority Granted to Regence

2.    Under ERISA, a denial of benefits is reviewed under a de novo standard unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Montour v. Hartford Life & Accident Ins. Co., 588 F. 3d 623, 629 (9th Cir. 2009).  Where the plan does grant such discretionary authority, the court reviews the administrator's decision for abuse of discretion.  Id.

---

[3] For instance, in his discussion of the time spent in surgery, Regence's reviewer states: "4 ½ hr. was spent in surgery.  It is unusual for a *routine hernia* to take more than one hour so this charge should be adjust[ed] for the hernia to pay 25% and the panniculectomy to pay 75%, expecially [sic] since there is nothing in the O[R] report which likely addresses the time factor and with the knowledge that panniculectomies often take 3-5 hours."  Reply to Pl.'s Trial Br. Ex. A (emphasis added).

3.     Here, because the Plan granted discretionary authority to the Committee to "[a]dminister, apply, construe, and interpret the Plan," AR 740, and the Committee delegated administrative duties to Regence, AR 684, the Court will review Regence's decisions under the abuse of discretion standard.  See Montour, 588 F.3d at 629.

**C.     Impact of Regence's Procedural Irregularities**

4.     Under both ERISA's procedural requirements and an abuse of discretion with heightened scrutiny standard, Regence's denial of coverage for Ms. Khani's 2007 operation was unacceptable for three main reasons: 1) Regence violated the plain language of the plan upon which it relied; 2) Regence failed to clearly explain the denial to Ms. Khani; and 3) the totality of the evidence shows that Regence did not act with good faith towards Ms. Khani.  As set forth below, the Court holds that Defendants abused their discretion by denying coverage for Ms. Khani's 2007 operation, and Ms. Khani is entitled to full coverage of that operation.

5.     Regence's failure to comply with several of ERISA's procedural requirements increases the Court's scrutiny of its decisions to deny benefits to Ms. Khani. See Abatie v. Alta Health & Life Insurance Company, 458 F.3d 955, 959, 972 (9th Cir. 2006) (observing that "[a] procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion" and concluding that "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest, applies here"); see Torres v. Reliance Standard Life Ins. Co., 319 Fed. Appx. 602, 603 (9th Cir. 2009) (holding that it was

correct for the district court to apply an abuse of discretion standard of review with a heightened "moderate level" of scrutiny due to procedural errors committed by the benefit plan); see Cushman v. Motor Car Dealers Servs., 652 F. Supp. 2d 1122, 1130-31 (C.D. Cal. 2009) (applying abuse of discretion standard "tempered by a large amount of skepticism" in light of serious procedural irregularities); see Lavino v. Metro Life Ins. Co., 2011 U.S. Dist. LEXIS 5893, at *26 (C.D. Cal. Jan. 20, 2011) (district courts within the Ninth Circuit generally apply an abuse of discretion with skepticism standard when procedural irregularities are present).

6.    "Under ERISA, plan administrators must follow certain practices when processing and deciding plan participants' claims." Abatie v. Alta Health & Life Insurance Company, 458 F.3d 955, 971 (9th Cir. 2006). According to ERISA's procedural requirements, claims procedures must "contain administrative processes and safeguards to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents." 29 C.F.R. § 2560.503-1(b)(5). In addition, an administrator must provide a plan participant with adequate notice of the reasons for denial "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," 29 U.S.C. § 1133(1), and must provide a "full and fair review" of the participant's claim, id. § 1133(2). Abatie, 458 F.3d at 971. The regulations call for a "meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be

stated in reasonably clear language." Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997).

7.    "A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." Abatie v. Alta Health & Life Insurance Company, 458 F.3d 955, 972 (9th Cir. 2006); see, e.g., Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1464 (9th Cir. 1997) (plan administrator abused its discretion by denying a claim without explanation and without obtaining relevant information, in violation of ERISA procedural requirements).  When an administrator can show that it has engaged in an "ongoing, good faith exchange of information between the administrator and the claimant," the court should give the administrator's decision broad deference notwithstanding a minor irregularity.  Abatie, 458 F.3d at 972 (quoting Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003)).  However, "[a] more serious procedural irregularity may weigh more heavily." Id.[4]

8.    Regence's denial of coverage for Ms. Khani's 2007 surgery violated ERISA's procedural requirements in several ways.  By pre-approving coverage of the

---

[4] Flagrant procedural violations alter the standard of review from abuse of discretion to de novo review.  Abatie, 458 F.3d at 971 (procedural violations of ERISA alter the standard of review if "the violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." (quoting Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005))).  The procedural irregularities that occurred here were not so flagrant as to require a de novo standard of review.  See id. at 972 (noting that only in a "rare class of cases" should an administrator's decision to deny benefits be reviewed de novo).

hernia repair and later retaining a refund of payment for that procedure, Regence violated the governing plan documents it relied upon, which state that pre-approved services, including pre-approved obesity services, will be paid for.  <u>See</u> AR 693, 711.  By doing so, Regence demonstrated that it lacked the administrative processes and safeguards necessary to ensure that benefit claim determinations were made in accordance with governing plan documents.  <u>See</u> 29 C.F.R. § 2560.503-1(b)(5).

9.     In addition, Regence failed to provide Ms. Khani with adequate notice of the reasons for its retention of the refund for the hernia repair with component separation "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  <u>See</u> 29 U.S.C. § 1133(1).  After obtaining the refund, Regence's communications with Ms. Khani did not once mention the hernia repair with component separation, much less indicate why it would not be covered.  <u>See</u> AR 541-45, 556-65, 583.  After the 2007 operation, Regence's only indirect mention of the hernia repair in its letters to Ms. Khani or her attorney discussed "denial of coverage for the complex abdominoplasty and panniculectomy *and related procedures*."  AR 583 (emphasis added).  Such communications instead focused on explaining why Regence would not cover the panniculectomy and perceived abdominoplasty.  <u>See</u> AR 541-45, 556-65, 583.

10.     Regence's reviewers equated abdominoplasty with the component separation aspect of the hernia repair, <u>see</u> AR 538, but Regence failed to state or explain this assumption to Ms. Khani, <u>see</u> AR 494-95, 504-05, 541-45, 556-65.  Given that

neither Ms. Khani nor her physicians had requested coverage for an abdominoplasty or mentioned abdominoplasty in descriptions of the 2007 operation, <u>see</u> 486-90, 496-99, 506-09, 526-30, 547-48, Regence's discussion of abdominoplasty without indicating how it related to the hernia repair did not constitute "reasonably clear language." <u>See</u> <u>Booton</u>, 110 F.3d at 1463; <u>see</u> U.S.C. § 1133(1).

11.    Rather than engaging in an "ongoing, good faith exchange of information" with Ms. Khani, Regence retained the refund of payment for Ms. Khani's 2007 operation without adequately explaining its actions. <u>See</u> <u>Abatie</u>, 458 F.3d at 972. As a result, Regence's denial of coverage for the operation is not entitled to broad deference. <u>See</u> <u>Abatie</u>, 458 F.3d at 972; <u>see</u> <u>also</u> <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 522 F.3d 863, 872-73 (9th Cir. 2008) (the degree of deference to which a plan administrator is entitled may be reduced entirely if the administrator abrogated its procedural responsibility to have a meaningful dialogue with a beneficiary). The Court therefore applies the abuse of discretion standard with moderate scrutiny upon that denial. <u>See</u> <u>Torres v. Reliance Standard Life Ins. Co.</u>, 319 Fed. Appx. At 603; <u>see</u> <u>Cushman</u>, 652 F. Supp. 2d at 1130-31.

12.    Further, in light of the procedural irregularities committed by Regence, the Court considers evidence outside of the Record in order to allow for full development of the administrative record. <u>See</u> <u>Abatie</u>, 458 F.3d at 973. Generally, judicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record. <u>Montour v. Hartford Life & Accident Ins. Co.</u>, 588 F.3d 623, 632 (9th Cir. 2009).

However, when a plan administrator has failed to follow a procedural requirement of ERISA, as here, the court is permitted to consider evidence outside the administrative record in order to recreate "what the administrative record would have been had the procedure been correct." <u>Abatie</u>, 458 F.3d at 972-73. Here, in order to recreate the administrative record had Regence not failed to adequately address payment of Ms. Khani's 2007 operation, the Court considers facts outside of the Record related to Regence's retention of the refund for payment of that operation. <u>See</u> <u>id.</u>

**D. Application of the Abuse of Discretion Standard with Moderate Scrutiny**

13.     Under the traditional abuse of discretion standard, an ERISA administrator abuses its discretion when it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact. <u>Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, et. al</u>, 410 F.3d 1173, 1178 (9th Cir. 2005) (citing <u>Bendixen v. Standard Ins. Co.</u>, 185 F.3d 939, 944 (9th Cir. 1999)). A decision of a plan administrator shall be upheld "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." <u>Id.</u> (quoting <u>Estate of Shockley v. Alyeska Pipeline Serv. Co.</u>, 130 F.3d 403, 405 (9th Cir. 1997)). However, the decision shall be reversed if the entire record leads to a "definite and firm conviction that a mistake has been committed." <u>Id.</u> at 1179 (quoting <u>Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.</u>, 508 U.S. 602, 622 (1993)). While recognizing the traditional abuse of discretion

standard, the Court will apply additional skepticism in light of the serious procedural irregularities committed by Regence.  See Cushman, 652 F. Supp. 2d at 1133.

14.     Here, review of the entire Record regarding Defendants' decision to deny coverage for Ms. Khani's 2007 operation leads to the definite and firm conviction that mistakes were committed by Defendants.  See Boyd, 410 F.3d at 1178.  Specifically, Regence abused its discretion by pre-approving coverage of the hernia repair with component separation and subsequently retaining a refund of its payment for the procedure.  See AR 494; Khani Decl. ¶ 12 (docket no. 48).  Given that the plain language of the plan on which Regence relied pledges that pre-approved services, including pre-approved obesity services, will be paid for, AR 693, 711, Regence's decision conflicts with the plain language of the plan and was thus an abuse of discretion.  See Boyd, 410 F.3d at 1178.

15.     Regence additionally abused its discretion by failing to explain its eventual decision to deny coverage for the hernia repair with component separation.  See Boyd, 410 F.3d at 1178.  When Regence obtained and retained a full refund for the 2007 operation, Regence did not communicate to Ms. Khani how the hernia repair would be paid for or how it related to other procedures for which Regence denied coverage.  See AR 541-45, 556-65, 583.  This failure to explain its denial for a pre-approved service was an abuse of discretion.  See Boyd, 410 F.3d at 1178; see Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1464 (9th Cir. 1997) (plan administrator abused its discretion by denying a claim without a rational explanation).

16.     Further, Regence provided no reasonable explanation in the Record for denial of Ms. Khani's hernia repair with component separation.  In particular, Regence provided no reasonable basis in the Record for assuming that the component separation aspect of the hernia repair was an abdominoplasty.  See AR 538.  Ms. Khani and her physicians had not sought pre-approval or post-service coverage for an abdominoplasty, and they never described performance of an abdominoplasty in any of their pre- or post-service descriptions of the operation.  See AR 486-90, 496-99, 506-09, 515-20, 526-30, 547-48.  Further, Regence provided no factual basis for assuming that component separation was equivalent in any way to abdominoplasty or that the component separation was not an integral aspect of Ms. Khani's hernia repair.  See AR 492-95, 501-05, 537-40, 550-55.  Because Regence provided no reasonable basis for determining that the component separation aspect of the hernia repair was equivalent to a cosmetic procedure that it would not cover, Regence abused its discretion.  See Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 538 (9th Cir. 1990) (a denial of benefits was properly deemed arbitrary and capricious because it lacked a reasonable basis).

17.     Had Regence denied coverage of the panniculectomy without committing serious procedural irregularities, there would be little precedent with which to question the validity of its decision to deny coverage of the panniculectomy.  See Montour, 588 F.3d at 629 (holding that a straightforward application of the traditional abuse of discretion standard permits a plan administrator's decision to be upheld if it is "grounded on *any* reasonable basis.").  However, applying the abuse of discretion standard with

moderate scrutiny, Regence's denial of coverage for the panniculectomy was problematic because it was made without adequate recognition for the cause of Ms. Khani's panniculitis and the need for Ms. Khani's panniculectomy.  See Booton, 110 F.3d at 1464 (it was an abuse of discretion for a plan administrator to deny a claim while violating ERISA procedural requirements and ignoring relevant information regarding the cause for Plaintiff's need for medical care); see Cushman, 652 F. Supp. 2d at 1133-34 (it was abuse of discretion to terminate plaintiff's benefits without addressing his foot and/or leg pain).

18.    The Plan Description relied upon by Regence differentiated reconstructive services from cosmetic services according to the following statement:

> The definition of reconstructive may be based on two distinct factors: 1) whether the service is primarily indicated to improve or correct a functional impairment or is primarily to improve appearance; and 2) what the etiology of the defect is (e.g., . . . post-therapeutic intervention[)] . . . Cosmetic services are usually considered to be those that are primarily to restore appearance and that otherwise do not meet the definition of reconstructive or those whose etiology is not exempted from the definition of cosmetic.

AR 1.  Regarding the first factor, Ms. Khani's physicians consistently stated that the panniculectomy was needed to address her panniculitis, which manifested as recurrent infrapannicular rashes, infections, ulcerations, and pain and required medicated powders and ointments.  See AR 488, 497.  Both Dr. Paige and Dr. Hunter described the extent of the panniculitis in their letters to Regence, AR 497, 508, and a clinic note dated in April

2007 written by Dr. Paige clearly documented the finding of "significant rashes" and ulceration on physical examination, AR 488.

19.    Equally important, Ms. Khani's physicians stated that removal of the pannus would help Ms. Khani heal from her hernia repair since the component separation aspect of the repair carried "a significant risk of wound infection and poor healing due to devascularization of her marked abdominal pannus." AR 508; see AR 497. As indicated by Ms. Khani's physicians, given the complexity of the ventral hernia repair procedure, the panniculectomy would improve Ms. Khani's healing and lower her risk of infection. See AR 497, 508.

20.    Ms. Khani and Dr. Paige explicitly told Regence that the panniculectomy was not cosmetic since the procedure would not make Ms. Khani's abdomen flat or otherwise improved from an appearance standpoint. AR 508, 533 (following the surgery, Ms. Khani sent pictures of her abdomen to Regence, stating, "As the photographs clearly and unequivocally demonstrate, no cosmetic procedure with such an outcome would have been acceptable to me, or any other patient.").

21.    Despite the documentation and reasoning submitted by Ms. Khani and her physicians, Regence concluded that Ms. Khani sought the panniculectomy primarily for cosmetic reasons (for "feature alteration") and the documentation submitted did not provide "evidence of any medical complications or functional impairment."[5] AR 543.

_____

[5] Regence supported its conclusions by stating that "preoperative photographs did not document any rashes, skin sores, or interigo [sic] beneath the pannus." AR 556. However, Regence relied

Regence maintained this position even though the Plan Description defines functional

impairment "as a state in which the special, normal or proper action of any body or organ

is damaged . . . some dermatologic conditions may significantly alter the function of the

skin." AR 2. The Court can find no reasonable basis for Regence's conclusion that

recurrent rashes and ulcerations constitute normal or proper function of the skin on

Ms. Khani's pannus; such conditions clearly appear to constitute a functional impairment.

22. Further, the Record shows that while Regence focused on assessing

whether Ms. Khani's panniculitis was a functional impairment, it paid virtually no

attention to Dr. Paige and Dr. Hunter's understanding that the panniculectomy would

help Ms. Khani to heal from and avoid infection resulting from her complicated ventral

hernia repair with component separation procedure. Contrary to Regence's claim that

Ms. Khani's physicians did not document "any medical complications" related to the

pannus, AR 556, Dr. Paige and Dr. Hunter described the medical complications that

could be avoided through performance of the panniculectomy, AR 497, 508. Dr. Paige

and Dr. Hunter's reasoning appeared to align with the Plan Description's definition of

medical necessity, which states that a treatment is medically necessary if it is, among

other things, "The most appropriate service or supply that is essential to the patient's

needs [and a]ppropriate as good medical practice." AR 688.

too heavily on one set of photographs taken in May 2007 when Dr. Paige and Dr. Hunter, who
examined Ms. Khani in person over time, had already documented the recurrent nature of Ms.
Khani's rashes, infections, and ulcers.

23.     Finally, even though Dr. Paige told Regence that the panniculectomy would not produce a cosmetic result and Ms. Khani sent Regence post-operative photos to show that she did not find the procedure to be cosmetically "acceptable," AR 508, 533, Regence stubbornly claimed that the panniculectomy was performed primarily for cosmetic reasons. <u>See</u> AR 543. Regence's disregard for the documentation and opinions submitted by Ms. Khani and her physician regarding the need for the panniculectomy was an abuse of discretion. <u>See</u> <u>Booton</u>, 110 F.3d at 1464.

24.     Regarding the etiology of the panniculitis, as noted repeatedly by Ms. Khani's physicians, Ms. Khani's panniculitis resulted directly from the gastric bypass she received in 2006. <u>See</u>, <u>e.g.</u>, AR 497, 508 (Dr. Paige and Dr. Hunter's notes both state, "[The open gastric bypass] has resulted in an overhanging pannus with recurrent infrapannicular rashes and sores."). Regence appears to have ignored the applicable Medical Policy, which states that Regence's exclusion for cosmetic services includes "all services primarily to improve appearance, *except those due to prior trauma or therapeutic interventions*." AR 2 (emphasis added). Instead of recognizing the cause of Ms. Khani's panniculitis and the need for a panniculectomy, Regence improperly categorized the panniculectomy as cosmetic rather than reconstructive. <u>See</u> AR 543.

25.     Given that Ms. Khani's panniculitis was a direct result of a pre-approved obesity surgery and the panniculectomy was needed to address and prevent functional impairment, the Plan Description indicates that the panniculectomy was reconstructive and should have covered. <u>See</u> AR 1. Because Regence denied coverage of the

panniculectomy while ignoring the cause of Ms. Khani's panniculitis and the need for a panniculectomy, Regence abused its discretion.  See Booton, 110 F.3d at 1464; see Cushman, 652 F. Supp. 2d at 1133-34.

26.     In light of Regence's serious procedural irregularities, unexplained denial of coverage for a pre-approved service, disregard for the cause of and need for Ms. Khani's panniculectomy, and erroneous acceptance of a full refund despite its concession that a portion of the surgery was covered, this Court concludes that Regence's denial of coverage for Ms. Khani's 2007 operation was not "a reasonable interpretation of the plan's terms" or "made in good faith."  See Boyd, 410 F.3d at 1178.  Therefore, that denial was an abuse of discretion.

**E.      Relief Awarded to Ms. Khani**

27.     Under 29 U.S.C. § 1132(a)(1)(B), 1132(a)(3), Ms. Khani is entitled to recover benefits due to her under the terms of the Plan.  Plaintiff is thus entitled to have Regence reimburse her for the $6,000 she paid in advance to the Hospital for the panniculectomy, together with pre-judgment interest at the rate of 4.95% from

///

///

///

///

///

June 28, 2007,[6] to the date of judgment, compounded annually, as well as post-judgment interest as specified by 28 U.S.C. § 1961.

28.    Plaintiff is additionally entitled to have Regence pay the Hospital for the remaining cost of the 2007 operation such that the Hospital no longer has a claim against her for any portion of that operation.[7]

29.    Pursuant to 29 U.S.C. § 1132(g)(1), Ms. Khani is entitled to reasonable attorneys' fees and costs against Defendants Regence and the Plan.  Ms. Khani shall have fourteen (14) days from the date hereof to move for an assessment of reasonable attorneys' fees.  Ms. Khani may tax costs in the manner set forth in Local Rule CR 54(d)(1).

### III.    CONCLUSION

For the reasons stated above, the Court HOLDS that Defendants abused their discretion by denying coverage for Plaintiff's 2007 operation, and Ms. Khani is entitled to recover for the loss of such coverage.  Accordingly, the Clerk is DIRECTED to enter

---

[6] Ms. Khani has not identified the date of the pre-payment, although she indicated that it occurred after Regence denied coverage for the panniculectomy on June 25, 2007, and before the panniculectomy occurred on June 28, 2007.  Khani Decl. at ¶ 6 (docket no. 48).  Because Ms. Khani has not specified the exact date of her pre-payment, the Court will calculate pre-judgment interest running from the date the panniculectomy was performed.  Pursuant to Blankenship v. Liberty Life Assurance Co. of Bos., 486 F.3d 620, 628 (9th Cir. 2007), the pre-judgment interest rate is the rate prescribed by 28 U.S.C. § 1961.

[7] Regence may pay the Hospital a negotiated rate for the operation, which might be less than the $35,304.64 retail rate sought by the Hospital in its lawsuit against Ms. Khani.

judgment for Plaintiff and against Defendants consistent with these Findings of Fact and

Conclusions of Law.

IT IS SO ORDERED.

DATED this 19th day of September, 2011.

Thomas S. Zilly
United States District Judge